Nathan E. Burdsal (USB 11034)
Hutch U. Fale (USB 11189)
**PACIFIC LEGAL GROUP**
1979 N 1120 W
Provo Utah 84604
Emails
  nate@abflegal.com
  hutch@abflegal.com
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Brady Sefcik, an individual, Kent Giles, an individual, and Maggie Giles, an individual,<br><br>Plaintiffs,<br><br>    v.<br><br>Tristan Cravey, an individual,<br><br>Defendant. | **COMPLAINT** |

## INTRODUCTION

1.    This suit arises from false statements made by the defendant resulting in

substantial and life-altering losses for the Plaintiffs. This suit seeks to recover appropriate

damages resulting from the defendant's actions.

## THE PARTIES

2.    Brady Sefcik ("Brady") is an individual who resides in Utah County, state of

Utah.

3.    Kent and Maggie Giles are individuals who reside in Utah County, state of Utah.

1

4.      Tristan Cravey is an individual who resides in California, but does business in Utah.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Cravey.

6.      Cravey is subject to the court of general jurisdiction in Utah.

7.      The actions giving rise to this Complaint all took place in Utah, the harm is felt in Utah, and Cravey actively managed various Utah companies.

8.      As set forth in more detail below, Cravey controlled all aspects of various Utah companies including purchasing product, pricing product, marketing the product sold, paying costs, tracking funds, preparing reports, and handling customer service.

9.      As set forth in more detail below, Cravey engaged in a scheme to defraud Plaintiffs by reaching out to individuals whom he knows reside in Utah and soliciting investments from them.

10.     This suit arises out of and is related to Cravey's transitions in Utah, namely the management of the Utah companies and his unlawful solicitation.

11.     The amount in controversy far exceeds $75,000.00.

12.     Additionally, this case involves federal questions.

13.     Accordingly, jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, and 1332.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLGATIONS

*Brady Sefcik*

15.     Brady and Cravey had mutual acquaintances, but they had never done business together before April of 2022.

16.      In April of 2022 Cravey approached Brady about a business venture.

17.      Cravey explained that he had the ability to purchase high-quality products at extremely low rates.

18.      Cravey told Brady that Cravey had a supplier who had agreements with major retailers like Costco and Walmart whereby the supplier could purchase overstocked items at bulk and at prices significantly below retail.

19.      Cravey told this to Brady in a phone call from Cravey to Brady while Brady was in Utah.

20.      Cravey further told Brady that Cravey had started a corporation called, "Your Front Door, Inc." ("YFD").

21.      Cravey explained if Brady paid Cravey $30,000.00, Cravey would help Brady open a merchant store with Amazon.com.

22.      Cravey explained that he would run all aspects of the store including procuring product for the store, marketing the products, setting pricing for the product, shipping products that sold, and providing customer support.

23.      Cravey told Brady that Cravey would use his supplier contact to purchase the product for the store.

24.      In addition to the $30,000.00, Brady was required to provide money to Cravey for the purchase of product.

25.      Cravey generally refused to provide more detailed information about the supplier other than as stated above.

26.      Cravey explained he did not want to disclose more information because he was concerned that Brady would be able to go directly to his supplier.

27.     Cravey also refused to disclose the price the supplier would be paid for the products he would place in Brady's Amazon store.

28.     Instead, Cravey guaranteed that the Amazon store would produce a return of at least 10% every six weeks.

29.     Cravey's scheme was to take Brady's money, use that money to procure product at an undisclosed rate, price the product on Brady's amazon store to make Brady a 10% rate of return, and pocket the remaining funds as profit for himself.

30.     Brady was not required to do anything to get this return other than provide funds to Cravey.

31.     To open an Amazon store, Brady needed a company.

32.     Cravey told Brady that Brady should register his company in Utah.

33.     To induce Brady to invest, Cravey wrote in a text, "I'll never commit your money any differently than I would mine. Let's start where we're at. I want to under promise and over deliver and y'all no (sic) the process and be comfortable and then we can scale as fast as y'all want. Good thing is your money buys a tangible product. It's not like buying a stock that could go to zero of a huge risk. We mitigate that by analyzing the graphs and the products. The private label is where we will slay beyond imaginable. I just have to finish another hundred or so hours."

34.     Being thus induced to invest, Brady sent Cravey $30,000.00 and began sending other funds to purchase product.

35.     As instructed by Cravey, Brady registered the company "BR Logistics and Wholesale LLC" in Utah.

36.     Brady then used BR Logistics and Wholesale LLC to open a store with amazon.com.

37.     Brady gave total control of the store to Cravey.

38.     Cravey managed the store, purchased products for the store, sold products through the store, and managed customers.

39.     Cravey later provided a Services Agreement to Brady and asked Brady to share the Services Agreement with other individuals whom he might know.

40.     The Services Agreement generally articulated the terms set forth above and included a guarantee that Brady would receive a minimum of 10% every 75 days.

41.     For example, the Services Agreement required investors to provide Cravey "with all [the investor's] usernames, passwords and permissions necessary for YFD to fully operate the Store and access the Store's Amazon Seller Central Account."

42.     Brady was never asked to sign the Services Agreement.

43.     Between the spring of 2022 and the spring of 2023, Cravey provided various statements that showed Brady his investments were making substantial profits.

44.     Because of the profits that were shown, Brady continued to invest in the store.

45.     Throughout this period, Cravey managed Brady's store almost without input from Brady.

46.     For example, when another YFD's investor needed to generate sales of a product being held in both Brady's and the other investor's store, Cravey increased the price on Brady's store and decreased the price on the other investor's store.

47.     When Brady asked why there were no sales, Cravey explained that he was manipulating amazon's prices to ensure the other investor got the sales.

48.     Brady sent numerous wire transfers and credit card transactions to Cravey to continue purchasing product for sale.

49.    In total, Brady sent over $2,336,671.43 to Cravey either directly or through YFD.

50.    A substantial portion of these funds were debt Brady got from a loan from Amazon and from credit cards.

51.    Importantly, it was Cravey who instructed Brady on how to get the loan from Amazon.

52.    On December 21, 2022, Brady sent a screen shot of the loan from Amazon in the amount of $199,000.00 with the question, "Should I do it, do we have any really good roi stuff coming in"

53.    Cravey responded, "Yes".

54.    In early 2023, Brady received a notice from Amazon that products Cravey was selling in Brady's store were actually stolen goods.

55.    Brady was also contacted directly from an attorney insisting that product that Cravey had listed for sale on Brady's store was stolen.

56.    This communication was given to Cravey who assured Brady that the product was legitimate.

57.    It was around this time that Cravey disclosed to Brady that his supplier was named "Omar," and Cravey assured Brady that Omar would take care of the issues.

58.    Cravey told Brady that Cravey would provide invoices showing what was purchased.

59.    However, Cravey later told Brady, "you're going to have to buy 10 units from an authorized distributor to get an invoice."

60.     Cravey later produced invoices from "The Generis Group" and "TA Liquidations" both out of Ontario Canada. These invoices show items purchased directly by BR Logistics, YFD, and Cravey personally.

61.     This was the first time Brady had heard of The Generis Group and TA Liquidations.

62.     A search of the Ontario Business registrations does not include either of these entities are registered in Ontario.

63.     Further, the invoices do not support Cravey's representations that Brady was making 10% on the products.

64.     For example, one invoice shows that The Generis Group sold 4,800 Shark WV201 WANDVAC Handheld Vacuum on 24 pallets for 125.00 apiece. However, this same vacuum can be purchased for between $99.99 and $129.99 on Amazon.

65.     Another invoice shows that 650 Ninja bL 770 Mega Kitchen Systems were sold for $160.00 each. However, the same system is selling on amazon for $159.95.

66.     There is simply no way these products could have provided any return whatsoever, much less a 10% return.

67.     All the products listed on the invoices suffer from the same deficiency.

68.     Upon information and belief, these invoices are all fraudulent and were fabricated by Cravey or at the direction of Cravey.

69.     Cravey also handled the dispute with Amazon and communicated with Amazon.

70.     In the spring of 2023 Brady's Amazon store was permanently closed and deactivated by Amazon.

71.    Although there were significant goods in the store when it was deactivated, none of these products have been given to Brady.

72.    Brady asked Cravey, "Would you know for sure when you buy these bulk pallets, whether these were stolen & sold to you?"

73.    Cravey assured Brady, "I already called the guy I buy from, he's saying it's all overstock and 1000% legit."

74.    However, Amazon is holding well over half a million in product that belongs to Brady's store, and YFD's credit card processor is holding over $139,000.00 more of Brady's funds that is incurring substantial interest.

75.    Cravey or his agents has/have admitted that this credit card payment was fraudulent to his credit card processor.

76.    From his investments, Brady has received back $2,158,744.35 from Cravey.

77.    Further, Amazon is holding $285,446.37 worth of product that was purchased for Brady's store.

78.    In total, Brady has suffered losses of $492,792.94 in losses from his investment.

*Kent and Maggie Giles*

79.    Kent and Maggie Giles are related to Brady.

80.    In the Spring of 2022, the Giles had the right to open a Crumbl franchise in California.

81.    Cravey wanted the Giles to invest in his scheme.

82.    Cravey asked Brady to provide the Services Agreement to the Giles.

83.    Cravey knew the Giles resided in Utah when he provided the Services Agreement.

84.     When the Giles explained that they did not have $30,000.00, Cravey agreed that if the Giles would give him their rights to the Crumbl franchise, Cravey would help them open an Amazon store and manage all aspects of the store.

85.     This included managing that store, stocking the store with product, selling the product, and handling customer service.

86.     Cravey promised that the store would make a return of 10% every 75 days.

87.     In addition to the Crumbl franchise, the Giles would also be required to fund the store by sending money to Cravey either directly or through YFD.

88.     The Giles agreed to exchange their Crumbl franchise for the Amazon store opportunity.

89.     The Giles were instructed to open a business in Utah.

90.     Accordingly, the Giles opened KMG Essentials, LLC, a Utah limited liability company.

91.     The Giles' sole contribution toward the success of the business would be to provide funds to Cravey for the purchase of products.

92.     To provide funds, the Giles pulled out $130,000.00 from a retirement account to fund the store – resulting in over $30,000.00 in taxes and fees.

93.     The Giles sent Cravey $95,000.00 of these funds through YFD.

94.     Cravey did in fact manage the Giles' Utah business, procuring inventory, marketing inventory, selling inventory, and handling all customer issues.

95.     The Giles did not participate in the management of the store in any way.

96.     Cravey provided reports to the Giles showing that product was selling on their store and they were receiving an incredible ROI.

97.     Cravey asked for additional funds, and the Giles provided another $50,000.00 to Cravey.

98.     However, like Brady's store, the Giles' Amazon store was deactivated because it was being used to sell stolen goods.

99.     Significant product is still being held by Amazon.

100.    In total, the Giles invested $145,000.00 with Cravey and have received $106,412.00 back.

*After-effects of deactivation*

101.    Cravey later admitted to another third party that he knew the items being sold on Plaintiffs' store were all stolen.

102.    Cravey admitted that his supplier would pay truck drivers to re-route their deliveries and thereby steal the product that was later sold through the Amazon stores.

103.    Cravey never disclosed this information to Plaintiffs.

104.    Cravey was convicted of a felony of attempted unlawful sexual contact in Kingman Arizona.

105.    Cravey never disclosed his prior felonious history.

106.    Before the extent of Cravey's fraud was known by Brady, Cravey approached Brady about investing in a transportation company.

107.    Brady called a friend who owns a trucking company and asked if he would be interested in selling.

108.    The trucking company is located in Utah and is registered in Utah.

109.    The owner agreed to terms whereby both Brady and Cravey could invest in the trucking company in exchange for ownership in the Utah company.

110. Cravey came to Utah to sign the agreement and has made partial payment toward his ownership of the company.

111. However, Cravey also presented the idea that he would start a shipping logistics company that would manage loads for the trucking company as well as other trucking companies.

112. This company is called "Freight Logix."

113. Cravey asked for a buy in of $30,000.00 for this company.

114. At the time of this ask, Brady did not know and had no way of knowing that he had in fact lost almost half a million dollars due to Cravey's fraud.

115. After learning about the fraud, neither Brady nor the other investor has paid into this other company.

*Investment Contract*

116. Plaintiffs invested money with Cravey by either paying $30,000.00 in cash (Brady) or giving the rights to a Crumbl franchise (the Giles).

117. Plaintiffs thereafter gave Cravey funds to purchase products that Cravey would market and sell, giving Plaintiffs a promised 10% return every six weeks on their investment.

118. Cravey pooled the funds he received to purchase product and retained substantial amounts for his own use.

119. This pooling includes other investors from Nevada and Canada and upon information and belief, other states as well.

120. In other words, Plaintiffs' investments went to a common enterprise Cravey created and ran.

121.    Plaintiffs were guaranteed both verbally and in writing that they would receive profits from the efforts of Cravey and YFD.

122.    Plaintiffs' sole contribution was to provide money and Plaintiffs were wholly dependent upon Cravey's efforts to earn a return.

123.    Pursuant to the *Howey* test, these investments constitute securities and are hereinafter referred to as the "securities."

## FIRST CAUSE OF ACTION
### 15 USC § 77a et. seq.

124.    Plaintiffs reincorporate and restate the above-numbered paragraphs as if set forth in full herein.

125.    Before offering the securities, Cravey did not register the securities pursuant to 15 USC § 77f.

126.    Before offering the securities, Cravey did not prepare a prospectus meeting the requirements of 15 USC § 77.

127.    Cravey's made numerous misstatements and omissions regarding material facts regarding the securities sold.

128.    Prior to and contemporaneously to selling the securities, Cravey failed to inform Plaintiffs that Cravey was procuring product that was stolen.

129.    At the time he failed to include this important omission, Cravey knew or should have known the product was stolen.

130.    Indeed, Cravey led Plaintiffs to believe that he had vetted his supplier of products when in fact he had either not done so, or if he had, he knew the products were stolen.

131.    Cravey went so far as to create false invoices showing returns that were never actually realized.

132.    After Plaintiffs heard from Amazon that the products were stolen, Cravey continued to insisted that the products were legitimate.

133.    However, Cravey later admitted that he knew the products were stolen.

134.    Cravey has also admitted – either directly or through his agent – that the last credit card transaction between himself and Brady was in fact fraudulent.

135.    Cravey refused to provide information to Plaintiffs about his source of products to be sold on the various amazon stores.

136.    Further, Cravey made highly implausible statements including guaranteeing a high return without risk.

137.    But for these statements, Plaintiffs would not have made the initial investment into Cravey's scheme, and certainly would not have continued to fund his criminal enterprise.

138.    By selling the securities in question, Cravey employed a device, scheme, or artifice to defraud, or obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made in light of the circumstances under which they were made, not misleading, or engaged in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

139.    Cravey is strictly liable for his misstatements and omissions.

140.    Plaintiffs hereby tender such securities to Cravey.

141.    Accordingly, Cravey is liable to Plaintiffs in the amount the invested with him, less the amount they received, plus interests and costs as allowable by 15 USC § 77a et seq.

## SECOND CAUSE OF ACTION
18 U.S.C. § 1962

142.    Plaintiffs restate the paragraphs above as if stated in full herein.

13

143.    In the alternative, if the investments are not securities, Cravey should be liable under 18 U.S.C. § 1962.

144.    Cravey participated in a pattern of racketeering activity.

145.    Cravey accepted millions of dollars through wires and credit card processors.

146.    Cravey did so in interstate or foreign commerce.

147.    Cravey was able to procure millions of dollars from Plaintiffs as a result of this fraudulent or false disclosures.

148.    Cravey knew the product he was selling was stolen, yet he never disclosed this fact.

149.    Cravey's failure to disclose this material fact is a false of fraudulent pretense, representation, or promise.

150.    Instead, Cravey informed Plaintiffs that his supplier had some agreement with large retailers to purchase overstock.

151.    This was simply not true, and Cravey knew this was not true.

152.    Cravey utilized text messaging and email to facilitate or help carry out the scheme to defraud.

153.    Cravey provided fact invoices from non-existent companies to Brady via email.

154.    Further, Cravey knew he could not guarantee a return, yet he did so.

155.     Cravey's guarantee defrauded Plaintiffs by using false or fraudulent pretenses, representations, or promises.

156.    These facts were material facts to Plaintiffs' decisions to give Cravey their money.

157.    Cravey intended to defraud Plaintiffs.

158.   Cravey did so more than two times within 10 years of each other.

159.   Cravey used his common enterprise of YFD to facilitate this scheme to defraud.

160.   Accordingly, Cravey is liable under the federal RICO statute.

## THIRD CAUSE OF ACTION
Utah State Security Fraud

161.   Plaintiffs restate the above-stated paragraphs as if stated in full herein.

162.   The contracts sold in this case constitute investment contracts and are "securities" as that term is defined under Utah law.

163.   Cravey is not a licensed broker dealer or agent authorized to sell securities in Utah.

164.   Nevertheless he did so in violation of Utah Code Ann. § 61-1-3(1).

165.   The securities sold were not register in Utah and thus the sale of the securities was unlawful pursuant to Utah Code Ann. § 61-1-7.

166.   In selling these securities, Cravey made numerous false statements to induce the investment or omitted to state material facts necessary in order to make the statements made not misleading.

167.   Specifically, Cravey failed to disclose that the products that were to be put in the Plaintiffs' various amazon stores were stolen goods.

168.   Quite the opposite, Cravey assured both Brady and the Giles in separate instances that the product was "1000%" legitimate.

169.   Cravey failed to disclose that he had no invoices or proof that the products were legitimately procured.

170.   Cravey erroneously guaranteed Plaintiffs a rate of return with no risk.

171.   Cravey induced additional investments by providing invoices that were false.

172.   Cravey's false disclosures and failure to disclose were willful in that it was Cravey's conscious objective to induce Plaintiffs to purchase the securities.

173.   The false or omitted disclosures were of material.

174.   If Cravey had disclosed the scheme, Plaintiffs would have never invested.

175.   Accordingly, Cravey has violated Utah Code Ann. § 61-1-1(2).

176.   Cravey's violation of Utah Code Ann. § 61-1-1(2) was reckless or intentional.

177.   Plaintiffs hereby offer the security back to Cravey.

178.   Accordingly, Plaintiffs are entitled to damages in the amount paid less amount received plus 12% interest.

179.   Alternatively, Plaintiffs are entitled to three times the consideration paid for the security, together with interest, costs, and attorney fees, less any amounts received.

## FOURTH CAUSE OF ACTION
Utah Pattern of Unlawful Activity

180.   Plaintiffs restate the above stated paragraphs as if set forth in full herein.

181.   Cravey is an enterprise.

182.   Cravey created a scheme whereby he could use Plaintiffs as his pawns.

183.   He would use their money to procure goods he knew were stolen, sell those goods on Plaintiffs' amazon stores, and keep a substantial amount of the profit from the sales for himself.

184.   Cravey engaged in this scheme well over three times with each Plaintiff, resulting in dozens of transactions.

185.   In doing so, Cravey directly engaged in conduct that would constitute securities fraud in violation of Title 61, Chapter 1 of the Utah Uniform Securities Act.

186.    As set forth above, Cravey did so by (1) selling unregistered securities, (2) selling securities when not a licensed broker dealer, and (3) committing securities fraud.

187.    Cravey also received stolen property in violation of Utah Code Ann. § 76-6-408(2).

188.    Plaintiffs were damaged by Cravey's violations because they were induced to invest in Cravey's scheme.

189.    They all lost significant funds as a result of Cravey's scheme.

190.    Accordingly, Cravey is liable under Utah Code Ann. § 76-10-1605(1) for twice the amount of damages suffered by Plaintiffs plus court costs and attorneys fees.

## FIFTH CAUSE OF ACTION
Breach of Contract (Brady)

191.    Plaintiffs restate the above stated paragraphs as if set forth in full herein.

192.    Brady and Cravey entered into a contract whereby Brady was to provide funds to Cravey.

193.    In exchange, Cravey agreed to assist Brady in setting up and manage an amazon.com store.

194.    Cravey agreed to manage the store and promised Brady that Brady would receive no less than 10% return on any money Brady provided in 6 weeks.

195.    Brady complied with the terms of this agreement and paid Cravey well over $2,000,000.00 over the course about 8 months.

196.    However, Cravey has not provided the guaranteed return of 10%.

197.    The return was the material term that induced Brady to enter into the contractual relationship with Cravey.

198.    Accordingly, Brady is entitled to damages in an amount to be determined at trial,

but in an amount that is equal to the promised return.

### SIXTH CAUSE OF ACTION
Contract Nullification

199.    Plaintiffs restate the above stated paragraphs as if set forth in full herein.

200.    Brady was fraudulently induced to enter into a contract whereby he is required to

purchase ownership in Freight Logix.

201.    If Brady knew that Cravey had been lying to him about the products Cravey was

running through Brady's amazon store, he would have never continued to invest in Cravey's

companies.

202.    Additionally, the agreement in question is a non-enforceable investment contract

insofar as it constitutes and unregistered security, is void of required disclosures, and is

otherwise unenforceable.

203.    Accordingly, this Court should void this contract.

**PRAYER:**

WHEREFORE, Plaintiffs pray as follows:

1. For an award of damages pursuant to 15 USC § 77a- et seq, or in the alternative,

2. For an award of damages pursuant to 18 USC § 1962, and

3. For an award of damages pursuant to Utah Code Ann. § 61-1-1 et seq., and

4. For an award of damages pursuant to Utah Code Ann. § 76-10-1605, and

5. For an award of damages for breach of contract, and

6. For an order nullifying the investment in Freight Logix, and

7. For an award of attorneys fees as permitted by various statutes cited in this

    Complaint, and

18

8.  For an award of fees and costs associated with bringing this action, and

9.  For any other award allowable in law or equity and as are deemed appropriate by the Court.

DATED this 2 day of November, 2023.

PACIFIC LEGAL GROUP

/s/ Nathan E. Burdsal
Nathan E. Burdsal