IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRADY SEFCIK, KENT GILES, and MAGGIE GILES,<br><br>Plaintiffs,<br><br>vs.<br><br>TRISTAN CRAVEY,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:23-CV-807-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

This matter is before the court on Defendant Tristan Cravey's Motion for Partial Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.[ECF No. 32]. On March 19, 2025, the court held a hearing on the Motion to Dismiss. At the hearing, Plaintiffs Brady Sefcik, Kent Giles, and Maggie Giles were represented by Nathan E. Burdsal, and Defendant was represented by Sarah Elizabeth Spencer. The court took the motion under advisement. After considering the parties' arguments and the law and facts relevant to the pending motion, the court issues the following Memorandum Decision & Order.

## BACKGROUND

On a motion for judgment on the pleadings, the court accepts the factual allegations in the Complaint as it would on a motion to dismiss and considers all reasonable inferences in plaintiffs' favor. *Morse v. Regents of Univ. of Colo.*, 154 F.3d 1124, 1126-27 (10th Cir. 1998). Plaintiffs in this case accuse Cravey of orchestrating a scheme to deceive them into investing in Amazon stores that were allegedly fronts for selling stolen goods.

### A. Brady Sefcik

Brady Sefcik had mutual acquaintances with Cravey. In April 2022, Cravey approached him about a business venture. Cravey stated that he had the ability to purchase high-quality products at extremely low rates because he had a supplier who had agreements with major retailers, like Costco and Walmart, enabling him to buy overstock items in bulk and at prices significantly below retail prices. Cravey told Sefcik that if he paid him $30,000, Cravey would help Sefcik open a merchant store with Amazon.com. Cravey stated that he would run all aspects of the business if Sefcik provided the money. In addition to the $30,000, Cravey told Sefcik that he would need to provide money to Cravey for him to purchase products from his supplier. Cravey refused to disclose any more information about the supplier because he stated that he was concerned that Sefcik would then be able to go directly to the supplier.

Cravey also refused to disclose the price the supplier would be paid for the products that Cravey would place in Sefcik's Amazon store. Instead, Cravey guaranteed Sefcik that the Amazon store would produce a return of at least ten percent every six weeks. Cravey intended to use Sefcik's money to procure product at an undisclosed rate and then price the product on Sefcik's Amazon store so that Sefcik made a ten-percent profit and Cravey could keep the remaining funds as profit for himself. Sefcik was not required to do anything to get this return other than provide funds to Cravey and open an Amazon store in his name.

To induce Sefcik to invest, Cravey wrote in a text: "I'll never commit your money any differently than I would mine. Let's start where we're at. I want to under promise and over deliver and y'all no [sic] the process and be comfortable and then we can scale as fast as y'all want. Good thing is your money buys a tangible product. It's not like buying a stock that could go to zero off a huge risk. We mitigate that by analyzing the graphs and the products. The private label is where we will slay beyond imaginable. I just have to finish another hundred or so hours."

Sefcik alleges that Cravey induced him to invest, and he sent Cravey $30,000. He then began sending other funds to purchase products.

To open an Amazon store, Cravey told Sefcik start a company and register it in Utah. Sefcik registered the company "BR Logistics and Wholesale LLC" in Utah and used it to open his store on Amazon.com. Sefcik gave total control of the store to Cravey. Cravey managed the store, purchased products for the store, sold products through the store, and managed customers.

Cravey sent a Services Agreement to Sefcik and asked Sefcik to share the Services Agreement with other individuals he knew who might be interested. The Services Agreement generally provided the terms Cravey had with Sefcik and included a guarantee that Sefcik would receive a minimum of 10% every 75 days. Cravey never asked Sefcik to sign the Services Agreement.

Between the spring of 2022 and the spring of 2023, Cravey provided various statements that showed Sefcik his investments were making substantial profits. Because of the profits that were shown, Sefcik continued to invest in the store. Throughout this period, Cravey managed Sefcik's store with almost no input from Sefcik. For example, when another Cravey client needed to generate sales of a product being held in both Sefcik's and the other investor's store, Cravey increased the price on Sefcik's store and decreased the price on the other investor's store so that customers would by from the investor who needed the money. When Sefcik asked Cravey why there were no sales, Cravey explained that he was manipulating Amazon's prices to ensure that another investor got the sales.

Sefcik sent numerous wire transfers and credit card transactions to Cravey to continue purchasing products for sale. In total, Sefcik sent over $2,336,671.43 to Cravey either directly or through Cravey's company. A substantial portion of these funds were debt that Sefcik got from a loan from Amazon and from credit cards. Cravey had instructed Sefcik how to get a loan from

Amazon. On December 21, 2022, Sefcik sent a screen shot of the loan from Amazon in the amount of $199,000, with the question, "Should I do it, do we have any really good roi [return on investment] stuff coming in." Cravey responded, "Yes."

In early 2023, Sefcik received a notice from Amazon that the products Cravey was selling in Brady's store were stolen goods. An attorney also contacted Sefcik insisting that product Cravey had listed for sale on Sefcik's store was stolen. Sefcik gave this communication to Cravey, who assured Sefcik that the product was legitimate.

Around this time, Cravey disclosed to Sefcik that his supplier was named "Omar" and that Cravey would take care of the issues. Cravey told Sefcik that he would provide invoices showing what was purchased. However, Cravey later told Sefcik, "you're going to have to buy 10 units from an authorized distributor to get an invoice." Cravey later produced invoices from "The Generis Group" and "TA Liquidations," both out of Ontario, Canada. These invoices show items purchased directly by BR Logistics, YFD, and Cravey personally. This was the first time Sefcik had heard of The Generis Group or TA Liquidations.

A search of Ontario business registrations does not show that either of these entities are registered in Ontario. Furthermore, Sefcik alleges that the invoices do not support Cravey's representations that Sefcik was making 10% on the products. For example, one invoice shows that The Generis Group sold 4,800 Shark WV201 WNADVAC Handheld Vacuums for $125 apiece. However, this same vacuum can be purchased for between $99.99 and $129.99 on Amazon. Another invoice shows that 650 Ninja BL 770 Mega Kitchen Systems were sold for $160 each. However, the same system is selling on Amazon for $159.95. Sefick alleges that there is simply no way these products could have provided any return whatsoever, much less a 10% return, and all the products listed on the invoices suffer from the same deficiency.

Upon information and belief, Sefcik alleges that these invoices were all fraudulent and were fabricated by Cravey or at Cravey's direction. Cravey also handled the dispute with Amazon and communicated with Amazon. However, in the spring of 2023, Amazon permanently closed and deactivated Sefcik's Amazon store.

Although there were significant goods in the store when it was deactivated, Cravey has not given these products to Sefcik. Sefcik asked Cravey, "Would you know for sure when you buy these bulk pallets, whether these were stolen & sold to you?" Cravey responded, "I already called the guy I buy from, he's saying it's all overstock and 1000% legit." However, Amazon is holding well over half a million dollars in product that belongs to Sefcik's store, and Cravey's business YFD's credit card processor is holding over $139,000 more of Sefcik's funds that are incurring substantial interest. Cravey or his agents has/have allegedly admitted to the credit card processor that this credit card payment was fraudulent.

From his investments, Sefcik has received back $2,158,744.35 from Cravey. Amazon is holding $285,446.37 worth of product that was purchased for Sefcik's store. In total, Sefcik has suffered losses of $492,792.94 from his investment with Cravey.

**B. Kent and Maggie Giles**

Kent and Maggie Giles are related to Sefcik. In the spring of 2022, the Gileses had the right to open a Crumbl franchise in California. However, Cravey wanted the Gileses to invest in his scheme and asked Sefcik to provide the Services Agreement to the Gileses. When the Gileses explained to Cravey that they did not have $30,000 to invest, Cravey agreed that if the Gileses gave him their rights to the Crumbl franchise, Cravey would help them open an Amazon store and manage all aspects of the store. This included managing the store, stocking the store with product, selling the product, and handling customer service. Cravey promised the store would make a return of 10% every 75 days. In addition to the Crumbl franchise rights, the Giles would

also be required to fund the store by sending money to Cravey either directly or through his company, YFD. The Giles agreed to the deal.

Cravey instructed the Gileses to open a business in Utah. Accordingly, the Gileses opened KMG Essentials, a Utah limited liability company. The Gileses' sole contribution toward the success of the business would be to provide funds to Cravey for the purchase of products. To provide funds, the Gileses pulled out $130,000 from a retirement account, resulting in over $30,000 in taxes and fees. The Gileses sent Cravey $95,000 of these funds through Cravey's company YFD.

Cravey managed the Gileses' Utah business, procuring inventory, marketing inventory, selling inventory, and handling all customer service. The Gileses did not participate in the management of the store in any way. Cravey provided reports to the Gileses showing that product was selling on their store, and they were receiving a significant return on investment.

Cravey asked for additional funds, and the Gileses provided another $50,000. However, like Sefcik's store, Amazon deactivated the Gileses' Amazon store because it was allegedly being used to sell stolen goods. Amazon is still holding a significant amount of product. In total, the Gileses invested $145,000 with Cravey and have received back $106,412.

Plaintiffs allege that Cravey later admitted to another third party that he knew the items being sold on Plaintiffs' stores were all stolen. Cravey admitted that his supplier would pay truck drivers to re-route their deliveries and then steal the product that was later sold through the Amazon stores. Cravey never disclosed this information to Plaintiffs. Plaintiffs also learned from other sources that Cravey was convicted of a felony for attempted unlawful sexual contact in Kingman, Arizona. Cravey never disclosed his prior felony to Plaintiffs.

Before Sefcik knew the extent of Cravey's alleged fraud, Cravey approached him about investing in a transportation company. Sefcik called a friend who owns a trucking company and

asked if he would be interested in selling. The owner agreed to terms whereby Sefcik and Cravey could invest in the trucking company in exchange for ownership in the trucking company. Cravey came to Utah to sign the agreement and has made partial payment toward his ownership of the company. However, Cravey also presented the idea that he would start a shipping logistics company that would manage loads for the trucking company as well as other trucking companies. This company is called "Freight Logix." Cravey asked Sefcik for a buy in of $30,000 for this company. At the time he asked Sefcik for this investment, Sefcik did not know and had no way of knowing that he had lost almost half a million dollars due to Cravey's alleged fraud. After learning about the fraud, neither Sefcik nor the other investor has paid into Freight Logix.

Plaintiffs allege that their investments in the Amazon stores that went to Cravey were all pooled into a common enterprise Cravey created and ran. Plaintiffs claim that their funds were pooled with other investors from Nevada and Canada. Cravey guaranteed both verbally and in writing that Plaintiffs would receive 10% return on investment every 75 days. Plaintiffs, therefore, assert that their investments of funds with Cravey constitute securities.

## DISCUSSION

### Cravey's Motion for Judgment on the Pleadings

1. **FRCP 9(b)**

Cravey argues that the court should grant judgment on the pleadings because Plaintiffs' claims for relief under 15 U.S.C. § 77a for securities fraud, under 18 U.S.C. § 1962 for RICO violations, under Utah's Uniform Securities Act, Utah Code Ann. § 61-1-1(2), under Utah's Pattern of Unlawful Activity Act, as well as breach of contract and contract nullification claims are all subject to FRCP 9(b)'s heightened pleading standard and Plaintiffs fail to plead fraud with particularity as required by Rule 9(b). Plaintiffs, however, argue that Cravey has waived any objection to a lack of particularity under Rule 9(b) by answering the Complaint.

7

In this case, Cravey answered the Complaint on January 17, 2024, and then filed an Amended Answer on June 24, 2024. The right to object to pleadings based on Rule 9(b) is not absolute, and that right can be waived by failure to preserve it via a motion addressing the objection. *See, e.g., U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 697 (W. D. Tex. 2007). "A party who fails to raise a Rule 9(b) objection normally waives the requirement." *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 38-39 (N.D. Ill. 1984) (citing 2A James W.M. Moore, et al., Moore's Federal Practice ¶ 9.03 (2d ed. 1984).

In *Davsko v. Golden Harvest Products, Inc.*, 965 F. Supp. 1467 (D. Kan. 1997), the court considered a matter where, at summary judgment, defendants raised issues of the complaint's lack of particularity under Rule 9(b). *Id.* at 1473. The court determined that the defendants had waived any right to object under Rule 9(b), stating that "a rule 9(b) objection is waived unless made in a separate motion prior to or concurrent with the filing of a responsive pleading." *Id.* at 1474. The court concluded that the "defendants answered plaintiff's complaint without raising any objection under rule 9(b) [and, therefore,] defendants cannot argue almost a year later that plaintiff failed to plead fraud with particularity." *Id.*

In *Finman v. ClearCellular, Inc.*, 2:22-cv-272-JNP-JCB, 2023 WL 2742720, at *2 (D. Utah Mar. 31, 2023) (unpublished), Judge Parrish denied a motion to dismiss challenging particularity under Rule 9(b) as untimely. The court stated that "[b]ecause the defendants answered the original complaint . . . they waived their right to assert that these claims were not pled with sufficient particularity to permit them to respond to these claims." *Id.* To overcome what was an untimely motion to dismiss, the defendants in that case argued that the court should consider their motion as a motion for judgment on the pleadings under Rule 12(c) because a Rule 12(c) motion may be timely as long as it does not delay trial. *Id.* However, the court rejected that suggestion because the defendants did not argue "that they should prevail as a matter of law" for

8

failure "to state a claim for relief." *Id.* Rather, they principally asserted "that the plaintiffs did not plead their defamation and fraud claims with sufficient particularity." *Id.* The court explained that "[b]ecause Rule 12(c) is not a proper vehicle for an insufficient particularity argument, the court may not convert the defendant's untimely motion into a motion for judgment on the pleadings to save it." *Id.*

Here, Defendant has done what the court in *Finman* stated was improper: "Rule 12(c) is not a proper vehicle for an insufficient particularity argument." *Id.* "[T]he most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." *Clinton Sec. Benefit Life Ins.*, 63 F.4th 1264, 1277 (10th Cir. 2023). Similarly, this court cannot allow Cravey to raise a particularity argument in a Rule 12(c) motion when it should have been brought in a motion to dismiss. Cravey has filed two Answers without raising the particularity arguments he now asserts, which shows that there was sufficient particularity to allow Cravey to file a responsive pleading. Where a defendant files an answer, this purpose is fulfilled and any objection under Rule 9(b) is waived. The parties are almost an entire year into this litigation, have engaged in significant discovery, and enforcing the provisions of Rule 9(b) at this juncture will not further the primary purpose of the rule. Because Rule 12(c) is an improper vehicle to raise a previously waived objection to the Complaint under Rule 9(b), the court denies Defendant's Motion or Judgment on the Pleadings to the extent that it was brought under Rule 9(b).[1]

---

[1] Even if the Rule 9(b) arguments had not been waived, the court finds that the allegations of Plaintiffs' Complaint meet the heightened particularity requirements of the rule. The Complaint provides detailed facts as to the who, what, where of the alleged fraud.

### 2. Economic Loss Rule

Defendant also moves for judgment on the pleadings based on the economic loss doctrine. Defendant argues that Plaintiffs' claimed harm arises from contracts between the parties and Cravey owed no independent duty to them so the economic loss rule bars Plaintiffs' non-contract claims, including their statutory fraud and claim for fraudulent inducement, are barred by the economic loss rule. The economic loss rule precludes recovery for purely economic losses that arise from a contractual relationship. *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 13 (Utah 2003). Utah strictly enforces the economic loss rule, which states that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Hermansen v. Tasulis*, 2002 UT 52, ¶ 16, 48 P.3d 235.

However, most of Plaintiffs' claims are statutory claims, not tort claims. The economic loss rule only precludes tort claims. The statutory claims create an independent statutory duty for Cravey. For example, as the seller of a security, Cravey incurred duties not to omit material information and to make sure that all the information that he shared was true and accurate. That is not the same as the contract claims. In addition, the statutory claims allow treble damages that would not be recoverable under a breach of contract claim.

With respect to Plaintiffs' fraudulent inducement claim, Utah's economic loss doctrine does not always preclude a claim for fraudulent inducement. In *HealthBanc Int'l LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193 (Utah 2018), the Utah Supreme Court decided whether the economic loss rule in Utah extends to the tort of fraudulent inducement, and the Court specifically stated that its ruling was limited to the case presented in that appeal. *Id.* at 198. "[W]e do not foreclose the possibility of a fraudulent inducement exception in some other circumstance." *Id.* The Court refused to answer "the broad[er] question of whether there may

ever be a fraudulent inducement exception to the economic loss rule in Utah" because the economic loss rule has generally only been applied where a party's tort claims "are entirely duplicative of its contract claims." *Id.*

In *Ennis v. Alder Prot. Holdings*, Case No. 2:19-cv-512, 2021 WL 409785 (D. Utah Feb. 5, 2021), the court applied the reasoning set forth in *HealthBanc* and determined that a particular fraudulent inducement claim was not barred by Utah's economic loss rule. *Id.* at *8-11. After discussing *HealthBanc*, the court concluded that where fraudulent actions were taken before the existence of any contract, where the fraud-based claims are not mere duplications of the breach of contract claims and where it is likely that the defendant had an independent "duty to speak the whole truth," a fraud claim may proceed regardless of the economic loss doctrine. *Id.* at *11.

Here, as in *Ennis*, the underlying allegations of fraud include misrepresentation regarding the theft of the underlying goods being sold and the omission regarding Cravey's felony conviction. Both the misrepresentation and the omission were material and occurred prior to the existence of any contract. Neither the misrepresentation nor the omission is covered or discussed in a contract or agreement between the parties. In fact, the contract is simple—Plaintiffs were to pay Cravey a specific amount of money and Defendant would use the funds to generate a return payable at ten percent every seven weeks, with the principal remaining in place. Plaintiffs' contract claims are based solely on Cravey's failure to comply with the terms of the contract. Plaintiffs' fraud-related claims are based on Cravey's misrepresentations, omissions, and criminal actions. Each claim has different facts that must be proven in order to prevail. Also, the remedies and damages recoverable under each claim are different and distinct.

Accordingly, this case is like *Ennis* and under its analysis, Plaintiffs' fraud based causes of action are not barred by the economic loss rule because (1) the grounds for the fraud-based claims came about before any contract existed, (2) the factual claims and damages for the fraud-

based claims and the breach of contract claim are not identical, and (3) Cravey had a duty outside of the contract and set forth by statute. Moreover, at this stage of the litigation it is not clear whether the claims might be duplicative. Many complaints offer alternative bases for recovery, and Plaintiffs may plead in the alternative without being subject to dismissal. Fed. R. Civ. P. 8(d). Accordingly, to the extent that the claims are inconsistent, they are permissible at the pleading stage of the litigation. The court can more fully and properly address the economic loss doctrine at the summary judgment stage. The court, therefore, denies Cravey's Motion for Judgment on the Pleading to the extent that it is based on the application of the economic loss doctrine.

## CONCLUSION

Based on the above reasoning, Defendant's Motion for Partial Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.[ECF No. 32] is DENIED.

DATED this 16th day of April 2025.

BY THE COURT:

DALE A. KIMBALL
UNITED STATES DISTRICT JUDGE