# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **BRADY SEFCIK, KENT GILES, and MAGGIE GILES,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**TRISTAN CRAVEY,**<br><br>**Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-CV-807-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

This matter is before the court on Plaintiffs' Motion for Partial Summary Judgment [ECF Nos. 46] and Defendant's Motion for Summary Judgment [ECF No. 47]. On June 3, 2026, the court held a hearing on the motions. At the hearing, Plaintiffs Brady Sefcik, Kent Giles, and Maggie Giles were represented by Nathan E. Burdsal, and Defendant Tristan Cravey was represented by Sarah Elizabeth Spencer. The court took the motions under advisement. After considering the parties' arguments and the law and facts relevant to the pending motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Plaintiffs accuse Cravey of orchestrating a fraudulent investment scheme whereby Plaintiffs would open an Amazon store, turn complete control of those stores over to Cravey, and he would provide them with a promised return on their investments of money to him. However, the Amazon stores were just fronts for selling stolen goods.

### A. Brady Sefcik

Brady Sefcik had mutual acquaintances with Cravey. In April 2022, Cravey approached him about investing money with him. Cravey stated that he had the ability to purchase high-

quality products at extremely low rates because he had a supplier who had agreements with major retailers, like Costco and Walmart, enabling him to buy overstock items in bulk and at prices significantly below retail prices. Cravey told Sefcik that if he paid him $30,000, Cravey would help Sefcik open a merchant store with Amazon.com.  Cravey stated that he would run all aspects of the business as long as Sefcik provided the money.  In addition to the $30,000, Cravey told Sefcik that he would need to provide money to Cravey for him to purchase products from his supplier. Cravey refused to disclose any more information about the supplier because he stated that he was concerned that Sefcik would then be able to go directly to the supplier.

Cravey also refused to disclose the price the supplier would be paid for the products that Cravey would place in Sefcik's Amazon store. Instead, Cravey guaranteed Sefcik that the Amazon store would produce a return of at least 10% every six weeks. Cravey's scheme was to use Sefcik's money to procure product at an undisclosed rate and then price the product on Sefcik's Amazon store so that Sefcik made a 10% profit and Cravey could keep the remaining funds as profit for himself. Sefcik was not required to do anything to get this return other than provide funds to Cravey.

To induce Brady to invest, Cravey wrote in a text: "I'll never commit your money any differently than I would mine.  Let's start where we're at. I want to under promise and over deliver and y'all no [sic] the process and be comfortable and then we can scale as fast as y'all want. Good thing is your money buys a tangible product. It's not like buying a stock that could go to zero off a huge risk. We mitigate that by analyzing the graphs and the products.  The private label is where we will slay beyond imaginable. I just have to finish another hundred or so hours."  Sefcik was induced to invest and sent Cravey $30,000. He then began sending other funds to purchase products.

To open an Amazon store, Sefcik needed a company. Cravey told Sefcik to register his company in Utah. Sefcik registered the company "BR Logistics and Wholesale LLC" in Utah. Sefcik used this company to open his store on Amazon.com. Sefcik gave total control of the store to Cravey. Cravey fully managed the store, purchased products for the store, sold products through the store, and managed customers.

Cravey sent a Services Agreement to Sefcik and asked Sefcik to share the Services Agreement with other individuals he knew who might be interested. The Services Agreement generally provided the terms Cravey had with Sefcik and included a guarantee that Sefcik would receive a minimum of 10% every 75 days. Sefcik was never asked to sign the Services Agreement.

Between the spring of 2022 and the spring of 2023, Cravey provided various statements that showed Sefcik his investments were making substantial profits. Because of the profits that were shown, Sefcik continued to invest in the store. Throughout this period, Cravey managed Sefcik's store almost without input from Sefcik. For example, when another Cravey client needed to generate sales of a product being held in both Brady's and the other investor's store, Cravey increased the price on Sefcik's store and decreased the price on the other investor's store so that customers would buy from the investor who needed the money. When Sefcik asked Cravey why there were no sales, Cravey explained that he was manipulating Amazon's prices to ensure that another investor got the sales.

Sefcik sent numerous wire transfers and credit card transactions to Cravey to continue purchasing products for sale. In total, Sefcik sent over $2,336,671.43 to Cravey either directly or through Cravey's company. A substantial portion of these funds were debt that Sefcik got from a loan from Amazon and from credit cards. Cravey had instructed Sefcik how to get a loan from Amazon. On December 21, 2022, Sefcik sent a screen shot of the loan from Amazon in the

amount of $199,000, with the question, "Should I do it, do we have any really good roi stuff coming in." Cravey responded, "Yes."

In early 2023, Sefcik received a notice from Amazon that products Cravey was selling in Brady's store were actually stolen goods. Sefcik was also contacted directly by an attorney, Michael Murphy, insisting that product Cravey had listed for sale on Brady's store was stolen and demanding that the product not be sold. Sefcik gave this communication to Cravey, who assured Sefcik that the product was 1,000% legitimate. Cravey stated that he would take the necessary steps to resolve the issue. Cravey never told Sefcik that the products were stolen goods. Cravey would not have invested with Cravey if he knew the products were stolen.

Around this time, Cravey told Sefcik that he would provide invoices showing what was purchased. However, Cravey later told Sefcik, "you're going to have to buy 10 units from an authorized distributor to get an invoice." Cravey later produced invoices from "The Generis Group" and "TA Liquidations," both out of Ontario, Canada. These invoices show items purchased directly by BR Logistics, YFD, and Cravey personally. This was the first time Sefcik had heard of The Generis Group or TA Liquidations. A search of Ontario business registrations does not show that either of these entities are registered in Ontario.

Furthermore, Sefcik alleges that the invoices do not support Cravey's representations that Sefcik was making 10% on the products. For example, one invoice shows that The Generis Group sold 4,800 Shark WV201 WNADVAC Handheld Vacuums for $125 apiece. However, this same vacuum can be purchased for between $99.99 and $129.99 on Amazon. Another invoice shows that 650 Ninja BL 770  Mega Kitchen Systems were sold for $160 each. However, the same system is selling on Amazon for $159.95. Sefcik alleges that there is simply no way these products could have provided any return whatsoever, much less a 10% return, and all the

products listed on the invoices suffer from the same deficiency. Cravey created these fake invoices.

During discovery in this case, Cravey did not disclose any communications with his suppliers. He has claimed that he has no ability to communicate with his suppliers. He has not provided telephone numbers, email addresses, or real property addresses.

Cravey handled the dispute with Amazon and communicated with Amazon.  However, in the spring of 2023, Amazon permanently closed and deactivated Sefcik's Amazon store. Despite several opportunities in response to Amazon and during the course of discovery in this case, Cravey has not produced any evidence that he legitimately purchased the products.  Although there were significant goods in the store when it was deactivated, Cravey has not given these products to Sefcik.

Sefcik asked Cravey, "Would you know for sure when you buy these bulk pallets, whether these were stolen & sold to you?" Cravey responded, "I already called the guy I buy from, he's saying it's all overstock and 1000% legit."  However, Amazon is holding well over half a million dollars in product that belongs to Sefcik's store, and Cravey's business YFD's credit card processor is holding over $139,000 more of Sefcik's funds that are incurring substantial interest.  Cravey or his agents has/have allegedly admitted to the credit card processor that this credit card payment was fraudulent.

From his investments, Brady has received $2,158,744.35 back from Cravey. Sefcik is not moving for summary judgment on damages.

**B.  Kent and Maggie Giles**

Kent and Maggie Giles are related to Sefcik. Sefcik provided Cravey's Services Agreement to the Gileses. In the Spring of 2022, the Giles had the right to open a Crumbl franchise in California. When the Gileses explained to Cravey that they did not have the initial

5

buy-in fee of $30,000, Cravey agreed that if the Gileses gave him their rights to the Crumbl franchise, Cravey would help them open an Amazon store and manage all aspects of the store. As with the Sefcik arrangement, Cravey would fully manage and operate the store. The Gileses would only be required to send money to Cravey. Cravey promised the store would make a return of 10% every 75 days. In addition to the Crumbl franchise rights, the Giles would be required to fund the store by sending money to Cravey either directly or through his company, YFD.  The Giles were in California at the time and were invited to visit Cravey's warehouse where they saw a substantial amount of products. The Gileses agreed to the deal.

Cravey instructed the Gileses to open a business in Utah. Accordingly, the Gileses opened KMG Essentials, a Utah limited liability company.  The Gileses' sole contribution toward the success of the business would be to provide funds to Cravey for the purchase of products.  To provide funds, the Gileses pulled out $130,000 from a retirement account, resulting in over $30,000 in taxes and fees.  The Giles sent Cravey $95,000 of these funds through his company YFD.

Cravey managed the Gileses' Utah business, procuring inventory, marketing inventory, selling inventory, and handling all customer service.  The Gileses did not participate in the management of the store in any way.  Cravey provided reports to the Gileses showing that the products were selling on their store and they were receiving an incredible return on investment.

Cravey asked for additional funds, and the Gileses provided another $50,000.  However, like Sefcik's store, Amazon deactivated the Gileses' Amazon store because it was being used to sell stolen goods.  Amazon is still holding a significant amount of products. In total, the Gileses invested $145,000 with Cravey and have received back $106,412.

Plaintiffs also learned information about Cravey's educational and criminal background that they state would have caused them not to invest their money with Cravey. Cravey never disclosed these things to Plaintiffs.

Cravey was deposed during discovery, but he invoked his Fifth Amendment privilege in relation to anything relating to his dealings with Plaintiffs and did not answer any questions relevant to the case.

**DISCUSSION**

**<u>Cross Motions for Summary Judgment</u>**

Plaintiffs move for partial summary judgment on liability, asking the court to determine damages at a later date. In response, Cravey filed a motion for summary judgment on all Plaintiffs' claims.

1.  **Fifth Amendment**

As an initial matter, the parties dispute the impact of Cravey invoking the Fifth Amendment on the parties' motions for summary judgment. Plaintiffs argue that Cravey's invocation of the Fifth Amendment should result in an adverse inference against him. "The Fifth Amendment allows an individual not to answer official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *S.E.C. v. Smart*, 678 F.3d 850, 854 (10th Cir. 2012). "But 'to prevent a party from converting the Fifth Amendment privilege from its intended use as a shield against compulsory self-incrimination into an offensive sword,' 'a district court may strike conclusory testimony if the witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely responds to questions that are advantageous to his cause.'" *Id.* at 855 (quoting *United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1277 (10th Cir. 2008)).

7

In *Smart*, the court was addressing whether a party could withdraw the privilege for purposes of summary judgment after invoking it during discovery. *Id.* at 854-55. The court emphasized that the party could not use the privilege "to manipulate the litigation process" or to "'gain an unfair strategic advantage over opposing parties.'" *Id.* at 855 (citation omitted). To prevent such manipulation of the process, a refusal to answer can result in an adverse inference being drawn against the defendant. *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976). "'Silence is often evidence of the most persuasive character.'" *Id.* at 319 (citation omitted). The Court has repeatedly recognized that "'[f]ailure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question.'" *Id.* (citation omitted).

Cravey argues that an adverse inference drawn from his invocation of the Fifth Amendment privilege cannot be a shortcut to victory. But the cases Cravey relies on to assert that his refusal to answer questions should not result in a negative inference against him, do not stand for that proposition. In *Nationwide Life Ins. v. Richards*, 541 F.3d 903, 912 (9th Cir. 2008), the court applied the adverse inference.

Cravey argues that Plaintiffs do not have any other evidence to support their summary judgment. But he fails to acknowledge the evidence Plaintiffs present. Cravey tries to demonstrate that Plaintiffs' evidence is inadmissible. But, while Plaintiffs agree they could not obtain a declaration from one witness, that witness's testimony is not their only evidence pointing to the goods being stolen. Cravey does not respond to the statement of facts or present evidence rebutting the statement of facts. Rather, he makes blanket objections like he is responding to discovery requests. .

Cravey has not rebutted the rest of Plaintiffs' evidence nor cited any evidence that would contradict Plaintiffs' declarations and other evidence. An adverse inference is certainly

appropriate in this case where Cravey invoked the privilege in relation to every question of substance at his deposition. He deprived Plaintiffs of valuable information by so doing. Therefore, Plaintiffs are entitled to an adverse inference.

Moreover, Cravey seems to ignore that he has a burden to withstand summary judgment. Plaintiffs have put forth evidence supporting summary judgment. "To withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) (quotations omitted). Cravey cannot defeat summary judgment by "mere allegations or denials." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Cravey does not properly dispute any of the factual statements because he never cites to any evidence. Rather than disputing factual allegations by citing to the record, Cravey recited blanket objections to every factual assertion without any meaningful analysis. These are not proper objections. Cravey frequently objected to statements of fact on the basis that it assumes facts not in evidence. But at the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The "assumes facts not in evidence" objection goes to the form of the evidence, not to the evidence itself.

In addition, anytime Plaintiffs testified as to what Cravey told them, Cravey objected to it as hearsay. However, a statement by a party is not hearsay. Fed. R. Evid. 801(d)(2). Cravey also objects to five statements as lacking foundation. However, the declarations specifically provide that the declarant is making the declaration pursuant to personal knowledge. Cravey also objects that numerous statements are irrelevant, but "relevance is an exceptionally low bar." *United States v. Ferguson*, 140 F.4th 538 (4th Cir. 2025). Cravey does not explain why he thinks the statements are irrelevant or immaterial to the present dispute. Furthermore, Cravey objects that

9

the best evidence was not submitted, but Plaintiffs can get the evidence through testimony at trial. Cravey has not properly rebutted or disputed Plaintiffs' evidence.

### 2. Federal Securities Fraud Claim

Both parties contend that they are entitled to summary judgment on Plaintiffs' federal securities claim. As an initial matter, the parties dispute whether Cravey's investment scheme is a security subject to federal and state regulation. Cravey contends that the parties agreed to start a business together and Plaintiffs could only have potential claims related to joint ventures. "Congress 'determined that the best way to achieve its goal of protecting investors was to define the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary scope of a security.'" *S.E.C. v.* Shields, 744 F.3d 633, 641 (10th Cir. 2014). To further that goal "Congress 'did not attempt precisely to cabin the scope of the Securities Act,' but instead 'enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.'" *Id.* (citation omitted). A "security" may include "participation in any profit-sharing agreement" or "investment contract." *Id.* at 642. Over time, courts have classified a kaleidoscope of pecuniary arrangements as securities deserving protection. A current brand of securities fraud appears to be people soliciting investments for fraudulent amazon.com stores. *Hough v. Carroll*, No. 2:24-cv-02886, 2025 U.S. Dist. LEXIS 187187 (C.D. Cal. Sep. 23, 2025); *United States v. Jeremiah Joseph Evans*, Case No. 2:24-cr-0374-DS (D. Utah May 1, 2025).

In *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court established a three part test for determining whether a particular financial instrument constitutes an investment contract, and thus a security. *Id.* at 298-99. Under the test, a security is comprised of (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party. *Id.* Substance governs form in

determining whether an investment contract is a security-like interest in a common enterprise that is expected to generate profits. *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 851-52 (1975). The Supreme Court has long espoused a broad construction of what constitutes a security, aspiring "to afford the investing public a full measure of protection." *Howey*, 328 U.S. at 298. The *Howey* test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others in the promise of profits." *Id.* at 299. The Tenth Circuit and the Utah Supreme Court have both adopted and applied the *Howey* test over the years. *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082 (10th Cir. 2020); *Payable Accounting Corp. v. McKinly*, 667 P.2d 15 (Utah 1982).

Cravey argues that the parties' arrangement was not a security and that Plaintiffs miscast a private, owner-operated retail venture as a passive security, contradicting the economic reality test applied to joint enterprise interests. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946); *McGill v. Am. Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985). There is a presumption that an interest in a general partnership is not a security since investor partners are ordinarily granted significant control over the enterprise. *SEC v. Shields*, 744 F.3d 633, 643 (10th Cir. 2014).

In *Shields*, the court explained that the joint venture agreements were denominated as general partnerships and the presumption that an interest in a general partnership is not a security is because the "partners—the investors—are ordinarily granted significant control over the enterprise." *Id.* The Tenth Circuit's "primary inquiry in the partnership setting is . . . on the powers possessed by the partners." *Id.* at 644. "Investments satisfy the third prong of the *Howey* test 'when the efforts made by those other than the investor are the ones which affect significantly the success or failure of the enterprise.'" *Id.* at 645.  The inquiry focuses on the

11

matters such as the investor's powers, the information available to and the sophistication of the investor, and degree of speculation.

In this case, for a fee of $30,000 or the equivalent, such as the value of a Crumbl franchise, Plaintiffs could send their funds to Cravey, Cravey would set up an Amazon.com store or assist them in setting up the store, which Cravey would then fully operate. Plaintiffs had never started an Amazon.com store, or any kind of store, before investing with Cravey. Cravey would get further investment money from Plaintiffs to purchase products and sell the product through the store for a promised, certain return on the investment of 10% every six weeks. In addition, Cravey would not disclose to Plaintiffs where he was getting product from or for how much. He merely promised a 10% return every six weeks, and Plaintiffs trusted him based on Cravey's representations that he could get overstock products. However, unbeknownst to Plaintiffs, Cravey knowingly sold stolen goods through those stores in order to meet the promised returns. Plaintiffs did not know how the profits were actually being generated. It is undisputed that Plaintiffs were not involved operating the stores.

While the parties did not enter into a formal written agreement, Cravey memorialized this arrangement with an agreement he later sent to Sefcik so that Sefcik could forward it to others who might want to invest in the same scheme. Although the agreement was after Plaintiffs invested with Cravey, it mostly reflects the financial agreement that Plaintiffs have testified existed between the parties. Plaintiffs provided money to Cravey based on these representations and his misrepresentations that he had contacts for low-priced overstock goods with which he could turn a profit. Plaintiffs were not knowledgeable about any of the specific aspects of how Cravey planned to make the profit. They simply trusted Cravey to make it happen.

Cravey does not deny the investment scheme he had with Plaintiffs. In his deposition, Cravey did not deny that Plaintiffs invested in his enterprise. Cravey created a common

12

enterprise that he operated, deposited money into, and withdrew money from. Plaintiffs provided substantial funds in the form of cash, credit card transactions, and wire transfers to Cravey either directly or through "Your Front Door," which was his common enterprise. Your Front Door is where the funds were pooled. Cravey and his wife would withdraw these funds, often for just under $10,000 to avoid financial oversight.

Cravey promised Plaintiffs substantial returns from his efforts of running the Amazon.com stores. Plaintiffs only provided money, and Cravey told them he would handle everything. Cravey demanded that he be given full control over the amazon.com stores, including product acquisition, pricing, selling, and fulfillment. In the written agreement that Cravey prepared, investors were required to provide Cravey with all usernames, passwords, and permissions necessary "to fully operate the Stores and access the Store's Amazon Seller Central Account." Cravey solely determined "the amounts, product mix, and timing of the shipments of the Products." He would "promote the Products." He had the "sole discretion" to "set the retail price of the Products." He would perform "all supplementary operations necessary to successfully meet its obligations" including "the proper and correct handling of all purchase, sales, and transportation documents required for the purchase, receipt, processing, shipment, and sales of the Products."

In exchange, Cravey guaranteed Plaintiffs a return of 10% every six weeks. The agreement Cravey produced demonstrates clearly that both he and Plaintiffs intended that they benefit solely upon the efforts of Cravey. Cravey wrote, "[i]n the event that within seventy-five (75) days of the delivery of the Products to Amazon, the sales of the Products less return (the "Revenue") do not generate an amount equal or greater to the purchase Funds plus ten percent (10%) (the "Payout")," Cravey "will electronically transfer to Owner an amount equal to the difference between the Revenue and the Payout." The oral agreement between Plaintiffs and

Cravey did not require Plaintiffs to do anything to earn the promised 10% return other than to provide the initial funds. Cravey did all the acts affecting whether the enterprise was a success or failure and he retained all the power to make it happen. Once Amazon.com contacted Plaintiffs about the goods being stolen goods, they had no means to rebut the accusation. Cravey was the only one that could deal with the issue. As it turned out, he could not rebut the accusation, the stores were closed, and the entire investment scheme came to an end.

Cravey provides no factual allegations that would support the conclusion that the investments were simply a general partnership. The undisputed facts are that Plaintiffs gave Cravey money, Cravey pooled the money in his common enterprise of "Your Front Door," an account he controlled, and Plaintiffs expected profits solely from the efforts of Cravey, based on Cravey's representations and control of the stores. Factually, this arrangement demonstrates that the investments were securities. Accordingly, the investments Plaintiffs made with Cravey constitute securities under the *Howey* test.

Cravey's reliance on *Pinter v. Dahl*, 486 U.S. 622 (1988), to argue that there has been no sale or solicitation is misplaced. *Pinter* analyzed whether a broker/dealer of an unregistered security could be liable for securities fraud. The Supreme Court held that "it is settled that § 12(*l*) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value." *Id.* at 642. The Court recognized that "the statutory terms ["offer" and "sell"], which Congress expressly intended to define broadly . . . are expansive enough to encompass the entire selling process, including the seller/agent transaction." *Id.* at 643. The Court rejected the argument that purchase requirement limits liability to the owner of the security. *Id.* at 644. Rather, the Court concluded that "Congress intended §12(*l*) liability to extend to those who solicit security purchases." *Id.* at 647. Thus, liability extends to "persons who successfully solicit the

14

purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.*

Plaintiffs argue that *Pinter* in no way can be read to limit Cravey's liability. Cravey is not a broker/dealer. He is not an independent third party hired to sell toxic securities. He is the person from whom the securities were being purchased and is clearly the seller of the security. Cravey directly solicited Sefcik to purchase the security. He provided false and misleading information to Sefcik. Based on this false and misleading information, Sefcik invested. To procure Sefcik's continued investment, Cravey repeated the false and misleading information. Even after Amazon notified Sefcik that the store was selling stolen goods, Cravey continued to misrepresent the situation. Cravey also encouraged Sefcik to share this false and misleading information about the investment with others, including the Gileses. Cravey accepted funds and a Crumbl franchise from the Gileses in exchange for the securities. He did so either directly or indirectly through Your Front Door. Cravey is the seller of the security to both Sefcik and the Gileses.

Plaintiffs have established that Cravey made substantial misrepresentations of material facts in connection with the sale of the securities to convince Plaintiffs to invest in his scheme. To be actionable as securities fraud, a misrepresentation or omission of a fact, must be material. A misrepresentation is "material" if there is "a substantial likelihood that a reasonable shareholder would consider it important." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). An omission is "material" if there is "a substantial likelihood that disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.*

Cravey made numerous misstatements and omissions in procuring Plaintiffs' investments that would be considered important to a reasonable investor. The most notable omission was that

15

the products were stolen. Prior to investing, Cravey assured Plaintiffs that they were making a safe and secure investment. Unlike other investments that could go up in smoke, Cravey assured them that they were investing in physical products. He claimed to have access to overstock products that would allow him to turn a substantial profit. But Cravey failed to state that he was trafficking in stolen goods. After Sefcik got a notice from Amazon that the products were stolen, Cravey continued to deny the fact to Sefcik. Cravey produced fraudulent invoices that did not manage to convince Amazon about the propriety of the products. Cravey has not produced any factual information regarding his suppliers. Cravey also responded that he had no contact information for his alleged suppliers even though he had been buying millions of dollars of products from them. Cravey takes issue with the evidence that Plaintiffs have submitted with respect to the products being stolen, but he has not rebutted it and chose to invoke the Fifth Amendment regarding the issue.

In the case of *In re Par Pharmaceutical, Inc. Securities Lit.*, 733 F. Supp. 668 (S.D.N.Y. 1999), the district court reviewed the failure to disclose criminal conduct that could impact the investment as securities fraud. Likewise, in *In re Catanella and E.F. Hutton and Co.*, 583 F. Supp. 1388 (E.D. Penn. 1984), the court held that the failure to disclose racketeering activity was construed as sufficient to state a claim for securities fraud. No reasonable investor would knowingly invest in a company whose sole purpose was to be part of a criminal enterprise that stole and then resold product. The risk for investing in such a scheme goes much deeper than just losing the investment funds.

Other material misstatements included that Plaintiffs were guaranteed to receive 10% return on their investments every six weeks. This statement is a material misstatement because it is inherently misleading to guarantee a specific return. "Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as

16

guarantees or are supported by specific statements of fact." *Kowal v. IBM (In re IBM Corp. Sec. Litig.)*, 163 F.3d 102 (2d Cir. 1998). In this case, Plaintiffs relied on the guarantee of a return. Cravey went so far as to put the guarantee on paper, and it was used to assuage any doubts with the investments.

Cravey also failed to disclose his lack of education, lack of professional training, and criminal history. Plaintiffs testified that he portrayed himself as an Amazon.com store genius, but he was a high school dropout who spent most of his career working in landscaping. He also had a felony conviction in his past. Although Cravey argues that these matters are irrelevant, these omissions would be objectively material to a reasonable investor who was investing millions of dollars with Cravey. Plaintiffs' contention that they would not have invested with him had they known these facts is a reasonable assertion.

Plaintiffs argue that Cravey's misstatements were willful. Under federal law, to "establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *City of Philadelphia v. Fleming Companies*, 264 F.3d 1245 (10th Cir. 2001). "The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.*

In this case, Cravey has not rebutted the evidence demonstrating that the product he was selling through Plaintiffs' Amazon stores was stolen. Being able to procure products inexpensively was the key to his scheme. When Plaintiffs asked where the product was from, Cravey would only give general answers and expressed concern that the investors would go around him to the suppliers if they had any information about the suppliers. He knew that if he

17

told the real answer, Plaintiffs would not invest in his scheme. When Amazon notified Plaintiffs that the products were stolen, Cravey stated that he would take care of the situation. He did not provide Amazon with credible evidence that the products were legitimate. Cravey continued to claim that the product was 1000% legit, but he fabricated invoices to show the products were purchased when the product was not. Cravey has never provided any evidence to Amazon or in this litigation to suggest that he had legitimate suppliers. In discovery, he was asked to name his suppliers and provide information regarding them. He did not provide any information. Cravey's invocation of the Fifth Amendment also compels an adverse inference against him in this regard. Cravey's conduct demonstrates that he knowingly withheld this material information to mislead the investors.

Section 15 U.S.C. § 78i(i) provides that it is "unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." The Commission has established Rule 10b-5, which provides that it is "unlawful for any person, directly or indirectly, . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

"To state a cause of action under Section 10(b), a plaintiff must [establish] that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004). Plaintiffs have submitted sufficient evidence that Cravey made false statements or omitted

a material fact with scienter. Plaintiffs relied on his statements and would not have invested but for his misrepresentations and omissions. Cravey has not rebutted this evidence.

Cravey also argues that a claim under § 77*l* is untimely because it must be brought within one year after the violation upon which it is based and in any event within three years of the bona fide offering. 15 U.S.C. § 77m. The suit in this matter was filed November 3, 2023. The first alleged contribution in July 2022 is untimely. However, the correct statute of limitations for securities fraud is two years after the discovery of the facts constituting the violation or five years after such violation. 28 U.S. C. § 1658(b); 15 U.S.C. § 78c(a)(47); *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). This action was filed within these timeframes.

The court concludes that Plaintiffs are entitled to summary judgment on the liability portion of their federal securities claim. Accordingly, the court denies Cravey's motion for summary judgment on this claim.

### 3. Utah Code Ann. § 61-1-1

Plaintiffs argue that Cravey is similarly liable for securities fraud under Utah Code Ann. § 61-1-1 *et. seq.* Section 61-1-22 is fundamentally different from the federal private cause of action for violating Section 10(b) and Rule 10b-5. While the federal cause of action is implied, Utah Code is explicit as to civil liability. *Gohler v. Wood*, 919 P.2d 561 (Utah 1996). Section 61-1-22 prescribes liability for "a person who . . . offers or sells a security in violation of subsection 61-1-3(1);" or "offers, sells, or purchases a security in violation of Subsection 61-1-1(2)." Utah Code Ann. § 61-1-22(1)(a).

State law also applies *Howey* to determine whether an investment is a security, and Plaintiffs demonstrated that their investments in this case were securities, as discussed above. Sefcik's testimony that he relied on Cravey too much does not help Cravey's case. Cravey again asserts that he is not a seller to the Gileses. But state law applies to anyone "directly or

19

indirectly" offering or selling the security. Utah Code Ann. § 61-1-1. The Utah statute facially refutes Cravey's argument that he is not a seller because his statements were made indirectly through Sefcik. By taking the Gileses' Crumbl franchise and money, Cravey was a seller to the Gileses. There is also evidence that he knew that his misrepresentations to Sefcik would be passed along to the Gileses to induce them to invest. Cravey is a seller of securities to Sefcik and the Gileses under Utah state law.

Plaintiffs have also established that Cravey made numerous untrue statements of material facts and omitted material facts that were necessary for evaluating the statements he made to them. Cravey told Plaintiffs he had an opportunity to get overstock products for low prices when he knew he was trafficking in stolen products. He claimed that the investment was safer because it was in physical products when the investment was riskier because the investment was in selling stolen products. Cravey knew these statements and omissions were false. Cravey was purchasing stolen products for well below market value and then selling that product on Amazon using Plaintiffs' stores. He lied to Plaintiffs to hide his participation in this criminal enterprise. He engaged in a course of business which operated as a fraud and deceit upon Plaintiffs. Cravey has not properly refuted any of Plaintiffs' evidence.

Cravey has not rebutted Plaintiffs' evidence that the goods were stolen. Cravey did not produce evidence to Amazon to keep the stores going and did not present evidence in this litigation to rebut the claim. He also failed to testify on the issue because he invoked the Fifth Amendment.

Cravey claims that any statement made to Sefcik supports a statutory seller affirmative due care defense because there is no liability on the part of a putative seller if he did not know and in the exercise of reasonable care could not have known of the material untruth or omission. Cravey, however, presents no evidence in support of this defense. While he argues that he can

rely on the defense because none of Plaintiffs' evidence is admissible, the court disagrees. Cravey fails to acknowledge that he must refute Plaintiffs' factual statements, which he has failed to do because he invoked the Fifth Amendment. He cannot claim that facts are disputed when he does not testify to any other version of the facts. He chose to invoke the Fifth Amendment rather than provide his own version of the facts.

Because Cravey does not rebut Plaintiffs' evidence on this claim, the court grants Plaintiffs summary judgment as to liability on their state securities fraud claim and denies Cravey's motion for summary judgment on the claim.

### 4. Pattern of Unlawful Activity

The parties agree that Plaintiffs cannot state a federal Racketeer Influenced and Corrupt Organizations Act ("RICO") claim in addition to the federal securities claim. Therefore, based on the court's ruling above with respect to the securities claim, the court dismisses Plaintiff's alternative RICO claim .

Plaintiffs, however, argue that Cravey is liable for engaging in a pattern of unlawful activity pursuant to Utah state law, Utah Code Ann. § 76-17-401 ("UPUAA"). Under the UPUAA, a "pattern of unlawful activity" means: "engaging in conduct that constitutes the commission of at least three episodes of unlawful activity." *Id.* § 76-17-401(2).  Cravey argues that Plaintiffs cannot establish a claim for a pattern of unlawful activity for this one allegedly fraudulent scheme.

In *State v. Squires*, 2019 UT App 113, ¶ 53, 446 P.3d 581, 592-94, the Utah Court of Appeals found that the state could not establish a claim under the UPUAA because the defendant's "predicate acts of communications fraud extended over a short period of seven to eight months." The court explained that the UPUAA is modeled after the federal RICO Act and should be interpreted the same. *Id.* ¶ 50. "Under RICO it 'is well established that a single scheme

21

to accomplish one discrete goal, directed at a finite group of individuals, with no potential to extend to other persons or entities, rarely will suffice to establish a threat of continuing racketeering activity." *Id.* ¶ 52 (quoting *Pagel v. Washington Mutual Bank, Inc.*, 153 F. App'x 498, 502 (10th Cir. 2005). "'If a plaintiff alleges only a single scheme, a single injury, and few victims it is virtually impossible for plaintiffs to state a RICO claim.'" *Id.* (quoting *Western Assocs. v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001)).

Plaintiffs have alleged that certain crimes are the predicates for their cause of action—communications fraud, theft by deception, and receiving stolen property—in furtherance of Cravey's securities fraud. But as in *Squires*, Plaintiffs have not established anything more than a single scheme involving a few victims. Therefore, the court grants Cravey summary judgment on Plaintiffs' UPUAA claim.

### 5. Breach of Contract

Sefcik argue that Cravey is liable for breach of contract because he guaranteed a return of ten percent every six weeks on the funds Sefcik invested with him. Cravey failed to make numerous guaranteed payments, and Sefcik has been damaged as a result of the breach. Sefcik argues that the damages for breach of contract should be assessed at a separate damages hearing or on a motion for damages. Cravey, however, argues that Sefcik has failed to establish either a written or oral contract.

Cravey contends that the alleged oral contract between the parties is an oral agreement concerning the sale of goods over the amount of $500 and it is unenforceable under the statute of frauds. Utah Code Ann. § 70A-2-201. However, the contract is not for the purchase of goods. Sefcik is not claiming that Cravey was selling him goods. The alleged contract is an investment services contract. Sefcik agreed to give Cravey money to set up a store and then money to buy goods that Cravey would sell through the store, and Cravey agreed to provide a ten percent

22

return on the funds Sefcik invested with him.  But even if the statute of frauds provision was applicable, there is an exception in the statute itself. Subsection (3)(c) provides that the contract is enforceable even if it is not in writing "with respect to goods for which payment has been made and accepted." Utah Code Ann. § 70A-2-201(3)(c). There is no allegation that Cravey did not accept payment.  Therefore, the statute of frauds does not apply to the alleged oral contract and, even if it did, the exception for goods for which payment has been made and accepted applies.

Sefcik argues that Cravey is clearly liable for breach of contract. The terms of the contract are set forth in the statement of facts. These facts are not disputed in the opposition. Sefcik would pay Cravey $30,000.00. Sefcik would set up an Amazon.com store that Cravey would be fully in charge of running. Sefcik would then provide funds to Cravey for product. Cravey promised that Sefcik would receive a return of 10% every six weeks. Sefcik provided the funds to Cravey. Cravey, however, failed to provide the promised returns. While the agreement was an oral agreement, Cravey later provided a written statement that substantially contained the terms of the oral agreement.  Sefcik did not treat the Services Agreement as the operative contract, and it is not the agreement Sefcik seeks to enforce. Sefcik merely saw the Services Agreement as affirmation of the oral agreement that he already had with Cravey.

In addition, Sefcik relied on the spreadsheets he was receiving from Cravey to determine performance, but this does not indicate that there was no meeting of the minds. Quite the opposite. If there was no contract, Cravey would not be sending spreadsheets to Sefcik. Cravey claims that without a writing, Sefcik could concoct any terms he wants. However, the litigation process would keep this from happening. Sefcik has his own testimony and evidence supporting his version of the claim, and Cravey has failed to submit any evidence in response.

Cravey also incorrectly argues that he is not liable for the breach of contract because Amazon turned off the services, not him. But Cravey breached the agreement by failing to provide the promised return and failing to keep the store operational. Cravey should have been able to respond to Amazon and get the store back open. However, because he could not do so, the store remained closed and Cravey failed to pay any more returns. It would also be reasonably implied in the oral contract that Cravey was using overstock products, not stolen products. While Cravey argues that any losses are not attributable to him, he does not present any evidence to support his assertion. Cravey has failed to rebut Sefcik's evidence. Accordingly, the court grants summary judgment to Sefcik for liability on his breach of contract and denies Cravey's motion for summary judgment on this claim.

### 6. Contract Nullification Claim

Cravey argues that Plaintiffs' tort claim for contract nullification or rescission based on fraudulent inducement is barred by the economic loss rule. The economic loss rule precludes relief in tort for economic losses that arise from a contractual relationship. *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 42, 70 P.3d 1 (Utah 2003). However, the economic loss rule does not bar a rescission claim based on fraudulent inducement. Under Utah contract law, "a party who has been induced to enter a contract by fraudulent misrepresentations has two options: (1) it may elect to rescind the contract or (2) it may affirm the contract." *Thurston v. Block United LLC*, 2021 UT App 80, ¶ 16. "In either instance, the defrauded party may recover damages associated with the fraud." *Id.* (quoting *Ong Int'l (U.S.A.) Inc. v. 11th Avenue Corp.*, 850 P.2d 447, 457 (Utah 1993) (explaining that "monetary and punitive damages" are compensable rescissionary damages); *Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 639 (Utah Ct. App. 1987) (explaining that a party who affirms the contract may sue for damages thereon)).

While the court disagrees with Cravey that the economic loss rule bars Plaintiffs' claim for rescission, the court does not believe that Sefcik can maintain a claim for breach of contract and rescission. Under Utah law, it appears that Sefcik must choose one of the two options or be at risk of waiving his right to rescission. Accordingly, the court denies Cravey's motion for summary judgment based on the economic loss doctrine. But Sefcik should inform the court within thirty days as to whether he intends to pursue the breach of contract claim or rescission claim.

**CONCLUSION**

Based on the above reasoning, Plaintiffs' Motion for Partial Summary Judgment [ECF Nos. 46] is GRANTED and Defendant's Motion for Summary Judgment [ECF No. 47] is GRANTED IN PART AND DENIED IN PART, as discussed above. Plaintiffs are granted summary judgment as to liability on their federal and state securities fraud claims, and Sefcik is granted summary judgment as to liability on his breach of contract claim. Cravey is granted summary judgment in his favor on Plaintiff's federal RICO and state UPUAA claims. Sefcik should inform the court within thirty days as to whether he intends to proceed on a breach of contract claim or a rescission claim. Within thirty days of the date of this Order, the parties shall also inform the court how they intend to move forward on the issue of damages.

DATED this 3rd day of August 2026.

BY THE COURT:

_____
DALE A. KIMBALL
UNITED STATES DISTRICT JUDGE